1

2

3

4

5

6

7

8                     **UNITED STATES DISTRICT COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| HENRY HUGUES, | ) Case No. CV 17-3892-JPR |
| Plaintiff, | )<br>) |
| v. | ) **MEMORANDUM DECISION AND ORDER**<br>) **AFFIRMING COMMISSIONER** |
| NANCY A. BERRYHILL, Acting<br>Commissioner of Social<br>Security, | )<br>)<br>) |
| Defendant. | )<br>) |

**I.   PROCEEDINGS**

    Plaintiff seeks review of the Commissioner's final decision denying his applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed January 2, 2018, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

1

## II. BACKGROUND

Plaintiff was born in 1968. (Administrative Record ("AR") 77.) He completed 12th grade (AR 165) and last worked as a supervisor and driver for a transportation business (AR 175).

On July 10, 2013, and May 9, 2014, Plaintiff filed applications for DIB and SSI, respectively, alleging that he had been disabled since February 28, 2009, because of congestive heart failure, diabetes, arthritis, neuropathy, foot pain, "bad back," right-eye problems, and asthma. (See AR 22, 77, 140-43, 153-58.) After his applications were denied (see AR 86), he requested a hearing before an Administrative Law Judge (AR 91). A hearing was held on April 27, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (AR 38-76, 128.) In a written decision issued August 31, 2015, the ALJ found Plaintiff not disabled. (AR 22-35.) Plaintiff sought Appeals Council review and submitted additional evidence. (AR 17-18, 405-30.) On March 24, 2017, the council denied review, finding that the additional evidence did not provide a basis for changing the ALJ's decision, and ordered that the new evidence be made part of the administrative record. (AR 1-6.) This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial

evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's.  <u>Id.</u> at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the

claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, he is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

burden, a prima facie case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B. <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 28, 2009, the alleged onset date. (AR 24.) At step two, he concluded that Plaintiff had the following severe impairments: "obesity; diabetes mellitus; compensated congestive heart failure; [and] history of nonischemic cardiomyopathy with ICD generator implantation." (<u>Id.</u>) At step three, he found that Plaintiff's impairments did not meet or equal a Listing. (AR 26.) At step four, he determined that Plaintiff had the RFC to perform the full range of medium work (<u>id.</u>) and concluded that he could do his "hybrid" and "combination" past relevant work as a "superintendent of drivers," DOT 913.133-010, 1991 WL 687816, and "shuttle bus driver," DOT 913.663-018, 1991 WL 687828, "as each job is described in the DOT" (AR 30-31). Thus, the ALJ found Plaintiff not disabled. (AR 31.)

**V.  DISCUSSION**[2]

Plaintiff argues that the ALJ erred in evaluating the medical-opinion evidence and therefore in determining his RFC (J. Stip. at 9-13, 18-20) and failed at step four "to appreciate that [his] prior work was a composite job" (id. at 20-22, 24-26).  For the reasons discussed below, remand is unwarranted on either basis.

    A.   The ALJ Properly Evaluated the Medical-Opinion Evidence and Determined Plaintiff's RFC

Plaintiff argues that the ALJ failed to provide a specific and legitimate reason for rejecting treating physician Claudia Hernandez's opinions and crediting the opinion of consulting internist Rocely Ella-Tamayo.  (Id. at 9-13.)  Consequently, Plaintiff contends, substantial evidence did not support his RFC.  (Id. at 9.)

        1.   Applicable law

A claimant's RFC is "the most [he] can still do" despite impairments and related symptoms that "may cause physical and mental limitations" affecting "what [he] can do in a work setting." §§ 404.1545(a)(1), 416.945(a)(1).  A district court must affirm an ALJ's RFC assessment when the ALJ has applied the

---

[2] In Lucia v. SEC, 585 U.S. __, 2018 WL 3057893, at *8 (2018), the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.  To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings.  (See AR 17-18, 38-76; J. Stip. at 9-13, 18-22, 24-26; Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council).

proper legal standard and substantial evidence in the record as a
whole supports the decision. Bayliss v. Barnhart, 427 F.3d 1211,
1217 (9th Cir. 2005). The ALJ must consider all the medical
opinions "together with the rest of the relevant evidence."
§§ 404.1527(b), 416.927(b);[3] see also §§ 404.1545(a)(1),
416.945(a)(1) ("We will assess your residual functional capacity
based on all the relevant evidence in your case record.").

Three types of physicians may offer opinions in Social
Security cases: those who directly treated the plaintiff, those
who examined but did not treat the plaintiff, and those who did
neither. Lester, 81 F.3d at 830. A treating-source opinion is
generally entitled to more weight than an examining one, and an
examining-source opinion is generally entitled to more weight
than a nonexamining one. Id.; see §§ 404.1527(c)(1),
416.927(c)(1). This is so because treating physicians are
employed to cure and have a greater opportunity to know and
observe the claimant. Smolen v. Chater, 80 F.3d 1273, 1285 (9th
Cir. 1996). But "the findings of a nontreating, nonexamining

---

[3] Social Security regulations regarding the evaluation of
opinion evidence were amended effective March 27, 2017. When, as
here, the ALJ's decision is the final decision of the
Commissioner, the reviewing court generally applies the law in
effect at the time of the ALJ's decision. See Lowry v. Astrue,
474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of
regulation in effect at time of ALJ's decision despite subsequent
amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647
(8th Cir. 2004) ("We apply the rules that were in effect at the
time the Commissioner's decision became final."); Spencer v.
Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D.
Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any
express authorization from Congress allowing the Commissioner to
engage in retroactive rulemaking"). Accordingly, citations to 20
C.F.R. §§ 404.1527 and 416.927 are to the versions in effect from
August 24, 2012, to March 26, 2017.

physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing" reason. Magallanes, 881 F.2d at 751; see Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only a "specific and legitimate" reason for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). The weight given a treating or examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6)

In determining an RFC, the ALJ should consider those limitations for which there is support in the record and need not take into account properly rejected evidence or subjective complaints. See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant]'s subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC those findings from physician

opinions that were "permissibly discounted").

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

### 2. Relevant background

#### a. *Cardiologists*

Around the start of the relevant period for the DIB application, in late 2008, Plaintiff recorded an ejection fraction of 15 percent and was diagnosed with congestive heart failure and cardiomyopathy, among other conditions.[4] (<u>See</u> AR 418; <u>see also</u> AR 425 (Aug. 2008), 426 (Sept. 2008), 427 (Oct. 2008), 424 (Dec. 2008), 430 (Mar. 2009).) A cardiologist recommended that he seek emergency medical care and diagnostic testing. (AR 418.) But Plaintiff refused "because of insurance reasons" (<u>id.</u>) and apparently did not seek follow-up treatment until April 2013 (<u>see</u> AR 278).[5] At that time he was referred to another cardiologist, whom he saw a month later. (AR 251-55, 278.)

_____

[4] Ejection fractions measure how much blood is pumped from the left ventricle of the heart. <u>See</u> <u>Ejection Fraction</u>, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/17069-heart-failure-understanding-heart-failure/ejection-fraction (last updated Oct. 2016). An ejection fraction of "55% to 70%" indicates normal pumping ability and heart function, whereas an ejection fraction of less than 35 percent means "[s]everely below normal" pumping ability and a greater risk of life-threatening irregular heartbeats. <u>Id.</u>

[5] No medical records between March 2009 and April 2013 appear in the record.

Plaintiff reported fatigue and dyspnea on exertion and "mild" edema in his legs. (AR 251.) On examination, he was in "[n]o acute distress" and demonstrated "no chest wall tenderness," "no peripheral edema," "normal" pedal pulses, "[r]egular" heart rate and rhythm, and lungs "clear to auscultation." (AR 253.) The cardiologist ordered an echocardiogram. (AR 254, 256.) It revealed an ejection fraction of "20 to 25%." (AR 256 (June 2013).)

Over the next month, despite his continued complaints of dyspnea on exertion, Plaintiff's physical examinations revealed "no chest wall tenderness," "no peripheral edema," "normal" pedal pulses, and lungs "clear to auscultation." (See AR 260 (June 2013), 264-65 (July 2013).) The cardiologist diagnosed Plaintiff with cardiomyopathy and recommended an AICD, or defibrillator.[6] (AR 261.) It was implanted a few months later, in September 2013. (AR 353-56.)

The day before the implantation, Plaintiff's chest demonstrated no "radiographic" evidence of "acute disease" (AR 347), and a chest x-ray afterward revealed similar findings (see AR 348). Still, Plaintiff's "postoperative diagnoses" included "[n]onischemic cardiomyopathy," NYHA Class II "congestive heart

---

[6] An automatic implantable cardioverter defibrillator is a device placed under the skin; it tracks a person's heart rate and may serve as a pacemaker. See Implantable Cardioverter Defibrillator (ICD), Am. Heart Ass'n, http://www.heart.org/ HEARTORG/Conditions/Arrhythmia/PreventionTreatmentofArrhythmia/ Implantable-Cardioverter-Defibrillator-ICD_UCM_448478_Article.jsp (last updated Dec. 21, 2016). If the heart exhibits an abnormal rhythm, the device releases an electric shock that restores the rhythm to normal, potentially preventing cardiac arrest. Id.

failure,"[7] and an ejection fraction of "less than 30%." (AR 353.) In follow-up appointments through January 2015, despite occasionally reporting shortness of breath, his lungs were clear to auscultation, his heart had a regular rate and rhythm, and he had "[n]ormal" motor function in "all 4 extremities," no edema, and "normal" sensation. (See AR 386 (Sept. 2013), 383 (Nov. 2013), 380 (Feb. 2014), 308 (Mar. 2014), 377 (June 2014), 374 (July 2014), 370-71 (Sept. 2014), 366-67 (Dec. 2014), 362-63 (Jan. 2015).) Plaintiff's cardiomyopathy and congestive heart failure were noted as "[s]table," and he was consistently treated with only medication and recommendations to manage his "diet" and avoid "tobacco" and "caffeine." (See AR 387 (Sept. 2013), 384 (Nov. 2013), 381 (Feb. 2014), 309 (Mar. 2014), 378 (June 2014), 374 (July 2014), 371 (Sept. 2014), 367 (Dec. 2014), 363 (Jan. 2015).)

### b. *Dr. Hernandez*

Plaintiff began regularly meeting with Dr. Hernandez in April 2013.[8] (See AR 278.) He complained of a prior diagnosis

---

[7] The New York Heart Association places patients in one of four categories based on how much their heart condition limits them during physical activity. See Classes of Heart Failure, Am. Heart Ass'n, http://www.heart.org/HEARTORG/Conditions/ HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last updated May 8, 2017). The Class II category denotes "[s]light limitation of physical activity," "[c]omfortable at rest," and "[o]rdinary physical activity results in fatigue, palpitation, [and] dyspnea (shortness of breath)." Id.

[8] Dr. Hernandez apparently treated Plaintiff in 2006 or 2009 (see AR 400), but the earliest treatment notes of record date from April 2013 (see, e.g., AR 278). In an onset-date questionnaire she stated that she had treated Plaintiff since 2012. (AR 402.)

for "cardiac valve problem[s]" and heel pain, which he reported had "improved" with orthotics. (Id.) On examination, his lungs were clear to auscultation and his heart had a regular rate and rhythm. (Id.) She referred him to cardiology and continued him on orthotics. (Id.) Later that month, he complained of "pain all over [his] body." (AR 277.) On examination, his lungs were clear to auscultation, his heart had a regular rate and rhythm, and he had no edema. (Id.) She diagnosed him with "chronic generalized pain," continued him on a muscle relaxant, which help[ed] somewhat," and referred him to rheumatology. (Id.) He apparently met with a rheumatologist afterward but "declined" any "further evaluation." (See AR 275.)

In June 2013, Plaintiff reported "deteriorated" kidney function, "persistent" knee pain, and "joint pain" in one of his hands. (Id.) He also mentioned that he hadn't been checking his blood glucose levels even though he was diabetic. (Id.) On examination, his lungs were clear to auscultation, his heart had a regular rate and rhythm, and he had no edema in his joints or hands. (Id.) She diagnosed him with an acute kidney injury, uncontrolled diabetes, arthritis, and "stable" congestive heart failure. (Id.) She referred him to rheumatology and cardiology for follow-up treatment. (Id.)

Plaintiff was seen twice in July 2013 and discussed issues related to his diabetes. (AR 273-74.) On examination, his lungs were clear to auscultation, his heart had a regular rate and rhythm, and he had no edema. (Id.) He was again advised to follow up with rheumatology and cardiology. (Id.) The next month, Plaintiff complained of "foot pain." (AR 272.) On

examination, his lungs were clear to auscultation and his heart had a regular rate and rhythm. (Id.) He was prescribed Tylenol. (Id.)

In September 2013, following his "pacemaker placement," Plaintiff reported that he had "been wheezing" and mentioned a history of asthma. (AR 340.) On examination, his lungs exhibited "mild diffuse . . . wheezes," his heart had a regular rate and rhythm, and he had no edema. (Id.) She continued him on an Albuterol inhaler. (Id.) The next month, Plaintiff reported that he still "at times" had "shortness of breath [and] wheezing" and didn't feel that his breathing had "improved" with the inhaler. (AR 339.) On examination, his lungs were clear to auscultation and exhibited no "wheezing at this time," his heart had a regular rate and rhythm, and he had no edema. (Id.) She prescribed an Advair inhaler, but he apparently didn't receive it until his next visit, later that month. (AR 336, 339.) At that time, his lungs were clear to auscultation but exhibited some wheezes, his chest wall demonstrated some tenderness, his heart had a regular rate and rhythm, and he had no edema. (AR 336.) Dr. Hernandez noted that his kidney condition was "improving." (Id.) She recommended him for a pulmonary evaluation, restarted him on Advair, and ordered a chest x-ray. (Id.; see also AR 335 (Dr. Hernandez noting that pulmonary specialist had advised Plaintiff only on "w[eigh]t loss"), 344 (Nov. 2013 chest x-ray showing "[n]o radiographic evidence for acute disease," "mild" pleural thickening, and "mild chronic fracture deformities" in his lungs).)

By December 2013, his lungs were clear to auscultation, no

wheezing was noted, his heart had a regular rate and rhythm, and he had no edema. (AR 335.) An examination two months later, in February 2014, revealed the same. (AR 332.)

In March 2014, Plaintiff complained of swelling in his right calf. (AR 331.) He also reported being noncompliant with his diet, feeling short of breath "after walking 1 block," and being unable to carry "more than 10 [pounds] w[ithout] feeling [short of breath]." (Id.) On examination, his lungs were clear to auscultation, his heart had a regular rate and rhythm, and his right calf was slightly more swollen than his left. (Id.) She ordered medical images of his right leg (id.), which revealed "[n]o evidence of right sided deep venous thrombosis" (AR 312). He was prescribed pain medication (AR 331) but complained of right-leg pain a few weeks later (AR 330).

The same month, Dr. Hernandez wrote a letter on Plaintiff's behalf, indicating that he had diagnoses for diabetes, hypertension, hyperlipidemia, chronic kidney disease, arthritis, asthma, and cardiomyopathy. (AR 404.) He exhibited "dyspnea on exertion," which "limit[ed] his mobility at times." (Id.) And he could "walk approximately 1 block at a time without feeling short of breath" and had "an approximately 25 [pound] weight carrying limit before he fe[lt] short of breath." (Id.)

The next month, Plaintiff indicated that he was applying for disability and reported that he had "limitation of mobility due to dyspnea." (AR 329.) On examination, his lungs were clear to auscultation, his heart had a regular rate and rhythm, and he had no edema. (Id.) She diagnosed him with "atypical chest pain" and advised that he follow up with cardiology. (Id.) She also

14

noted that she had filled out paperwork for Plaintiff's disability application. (Id.)

Indeed, that month she completed an RFC questionnaire. (AR 400-01.) She stated that Plaintiff had the following diagnoses: diabetes, congestive heart failure, asthma, and cardiomyopathy with an ejection fraction of 20 percent in "2010." (AR 400.) He exhibited "shortness of breath," "[d]yspnea on exertion," "leg swelling," and joint pain in his "knees [and] back." (Id.) His medications caused drowsiness, dizziness, and upset stomach. (Id.) She opined that his symptoms would "[f]requently" interfere with his attention and concentration and that he would need to "recline or lie down" during a normal workday. (Id.) He could walk "1 block" "without rest or significant pain," sit for 30 minutes at a time, stand 15 minutes at a time, and "slow[ly]" walk "30-45 min[utes]" at a time. (Id.) He could sit for a total of four hours in an eight-hour workday and "combined stand/walk" for the same amount. (Id.) He would need to take five-minute breaks every hour "due to increased urination." (Id.) He could occasionally lift up to 10 pounds but never anything more. (AR 401.) He had no limitations with "repetitive reaching, handling or fingering." (Id.) And he would likely miss work "[t]hree or four times a month" depending on his "appointments with specialists." (Id.) Still, his prognosis was "stable" (AR 400), and Dr. Hernandez left blank whether Plaintiff was "physically capable of working an 8 hour day, 5 days a week . . . on a sustained basis" (AR 401).

In May 2014, Plaintiff complained of an ingrown toenail on his right foot. (AR 327-28.) The following month, he complained

of chest "pressure." (AR 323.) On examination, his lungs were clear to auscultation, his heart had a regular rate and rhythm, and he had no edema. (Id.) She advised that he follow up with cardiology. (Id.) He was not seen again by Dr. Hernandez until August 2014. (AR 320.) At that time, he complained of pain in his "joints." (Id.) His examination was normal except for some "tenderness to palpation" in his hands, and he was assessed with arthritis, for which he was referred to rheumatology. (AR 321.) No record of any rheumatology appointment appears in the record. Plaintiff apparently did see an orthopedic surgeon in March 2015 for right-ankle pain. (AR 394.) On examination, he exhibited "severe tenderness" over his "distal Achilles insertion" but otherwise had no swelling and full flexion "without any pain." (Id.) The surgeon assessed that he had "right Achilles tendinitis" and recommended only "physical therapy, rest, ice, and anti-inflammatories." (Id.)

In October 2014, Plaintiff continued to complain of joint pain. (AR 315.) His physical examination was normal except for some "mild pain" with motion in his hands. (AR 316.) Dr. Hernandez prescribed Tylenol. (Id.) A December 2014 x-ray of his left hand was "unremarkable." (AR 342.)

### c. *Dr. Ella-Tamayo*

In November 2013, Plaintiff saw Dr. Ella-Tamayo, who specialized in internal medicine, for an agency consultation, complaining of diabetes and congestive heart failure. (AR 292-97.) She had no medical records to review but obtained a medical history from Plaintiff's self-reports. (AR 292-93.) He stated that he had been "hospitalized for congestive heart failure in

16

2009 and 2010." (AR 293.) He experienced "shortness of breath
with prolonged walking and climbing up and down stairs," but he
did not "cough" or experience "wheezing." (Id.) He also had a
history of diabetes but experienced "[n]o numbness or tingling
sensation [o]f the extremities." (Id.)

On examination, he demonstrated "no dyspnea, cyanosis or
edema." (AR 294.) His lungs and heart appeared "normal." (AR
295.) His gait was "normal"; his back's range of motion was
"within normal limits"; his straight-leg raises were "90/90
degrees bilaterally"; and each of his upper- and lower-extremity
joints "revealed no inflammation or tenderness." (AR 296.) His
upper and lower extremities had "normal" sensation and ranges of
motion "within normal limits," and his motor strength was "5/5
symmetrically." (Id.) His grip strength was "75, 70, 65 pounds
on the right" and "55, 55, 50 pounds on the left." (AR 294.)

Dr. Ella-Tamayo opined that Plaintiff could push, pull,
lift, and carry "50 pounds occasionally" and "25 pounds
frequently." (AR 297.) He could stand and walk "6 hours out of
an 8-hour workday" and sit without limitation. (Id.) He was
able to "kneel and squat frequently" and had "no significant
functional impairment" in his hands. (Id.)

        3. <u>Analysis</u>

The ALJ did "not accord any evidentiary weight" to the March
and April 2014 opinions of Dr. Hernandez and instead gave "great
weight" to Dr. Ella-Tamayo's opinion. (AR 28-29.) The ALJ was
required to provide only a specific and legitimate reason for
doing so. See Carmickle, 533 F.3d at 1164. He in fact provided
several. As to Dr. Hernandez's opinions, they were "completely

contradicted" by the "treatment evidence of record," they were "contradicted" by Dr. Ella-Tamayo's opinion, and they "contradict[ed]" themselves.  (AR 28-29.)  And Dr. Ella-Tamayo's opinion, by comparison, was "consistent with the evidence" and supported by her own "detailed clinical findings."  (AR 29.) Each reason was proper.

### a.  *Treatment Evidence*

Contradiction with the medical evidence, including a doctor's own treatment notes, is a specific and legitimate reason to discount a treating physician's opinion.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (physician's opinion properly rejected when his own treatment notes "provide[d] no basis for the functional restrictions he opined should be imposed on [plaintiff]"); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected physician's opinion when it was contradicted by or inconsistent with treatment reports).

Here, Dr. Hernandez assessed Plaintiff with restrictive limitations as to standing, walking, sitting, lifting, and carrying (see AR 400-01, 404), which she attributed primarily to "shortness of breath" and "dyspnea on exertion" (see AR 400, 404).  As the ALJ found, however (AR 28), her own notes showed that Plaintiff's heart and lungs were frequently normal on examination, even when he had contemporaneously complained of shortness of breath or dyspnea.  (See, e.g., AR 277-78 (Apr. 2013), 275 (June 2013), 273-74 (July 2013), 272 (Aug. 2013), 339 (Oct. 2013), 335 (Dec. 2013), 332 (Feb. 2014), 331 (Mar. 2014), 329 (Apr. 2014), 323 (June 2014), 321 (Aug. 2014), 316 (Oct.

18

2014).)  Indeed, at appointments immediately preceding her March and April 2014 opinions, Dr. Hernandez observed that his lungs were clear to auscultation and his heart had a regular rate and rhythm.[9]  (AR 331 (Mar. 2014), 329 (Apr. 2014)); see Bayliss, 427 F.3d at 1216 (treating physician's opinion properly discounted when it is contradicted by her own "clinical notes," "recorded observations," and "opinions").

Although she observed some wheezing in September 2013 (see AR 340), Dr. Hernandez at the time prescribed Plaintiff various inhalers (AR 339-40) and thereafter found no further breathing issues on examination (see, e.g., AR 335 (Dec. 2013), 332 (Feb. 2014), 331 (Mar. 2014), 329 (Apr. 2014), 323 (June 2014), 321 (Aug. 2014), 316 (Oct. 2014)); see also Warre v. Comm'r, Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling.").  Occasional assessments of "shortness of breath" by Plaintiff's cardiologists, too, weren't noted on a "continued" basis.  (See AR 28; see also, e.g., AR 386 (Sept.

---

[9] Dr. Hernandez's opinions appeared to be based in part on Plaintiff's subjective complaints.  (Compare AR 331 (Mar. 14, 2014: Plaintiff complaining to Dr. Hernandez of feeling short of breath "after walking 1 block" and being unable to carry more than 10 pounds without feeling short of breath), with AR 404 (Mar. 21, 2014: Dr. Hernandez stating that Plaintiff "can walk approximately 1 block at a time without feeling short of breath"), and AR 401 (Apr. 2014: Dr. Hernandez stating that Plaintiff could lift only up to 10 pounds occasionally but never anything more).)  But the ALJ discounted the credibility of Plaintiff's subjective symptom statements, a finding he hasn't challenged on appeal.  (AR 29.)  Thus, to the extent applicable, Dr. Hernandez's opinions appear to have been less credible partly for this reason as well.  See Tommasetti, 533 F.3d at 1041; Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009).

2013), 383 (Nov. 2013), 380 (Feb. 2014), 308 (Mar. 2014), 377 (June 2014), 374 (July 2014), 370-71 (Sept. 2014), 366-67 (Dec. 2014), 362-63 (Jan. 2015)).  And Dr. Hernandez at one point referred Plaintiff to a pulmonary specialist, who apparently advised him only to lose weight, further undermining her reliance on and the apparent severity of his alleged respiratory symptoms. (See AR 335; see also AR 344 (Nov. 2013 chest x-ray showing "mild" lung condition with "[n]o radiographic evidence for acute disease").)

Dr. Hernandez attributed Plaintiff's limitations to leg swelling and joint pain as well.  (AR 400.)  But those findings were similarly contradicted by the medical record.  Dr. Hernandez, for example, frequently found no edema in his extremities.  (See, e.g., AR 253 (May 2013), 260 (June 2013), 264-65 (July 2013), 277-78 (Apr. 2013), 275 (June 2013), 273-74 (July 2013), 340 (Sept. 2013), 339 (Oct. 2013), 336 (same), 335 (Dec. 2013), 332 (Feb. 2014), 329 (Apr. 2014), 323 (June 2014), 321 (Aug. 2014), 316 (Oct. 2014).)  And physical examinations by other doctors revealed the same.  (See, e.g., AR 386 (Sept. 2013), 383 (Nov. 2013), 380 (Feb. 2014), 308 (Mar. 2014), 377 (June 2014), 374 (July 2014), 370-71 (Sept. 2014), 366-67 (Dec. 2014), 362-63 (Jan. 2015); see also AR 312 (Mar. 2014: medical imaging of right leg revealing no evidence of deep venous thrombosis), 342 (Dec. 2014: x-ray of left hand "unremarkable").)

Although Dr. Hernandez at times noted Plaintiff's self-reports of joint and other bodily pain (see, e.g., AR 277 (Apr. 2013), 275 (June 2013), 320-21 (Aug. 2014), 315-16 (Oct. 2014)), she prescribed only medication to treat it and nearly

20

consistently referred him to a rheumatologist (see id.). The one time he apparently followed up, he declined any "further evaluation." (See AR 275.) And even his March 2015 visit with an orthopedic surgeon for right-ankle pain revealed only that his ankle had no swelling and full flexion "without any pain," despite tenderness. (AR 394.) Thus, undermined by her own and other treatment notes throughout the record, Dr. Hernandez's restrictive opinions were appropriately discounted by the ALJ.

Plaintiff points out that he had an ejection fraction of 20 percent in 2010. (J. Stip. at 19.) His sparse medical records from that time, however, fail to demonstrate that such an ejection fraction resulted in any disabling impairment or chest pain, as alleged. (See id.) Instead, the medical evidence of record demonstrates that his heart condition was treated with a defibrillator in September 2013 and subsequently stabilized, as noted by Plaintiff's cardiologists. (See AR 387 (Sept. 2013), 384 (Nov. 2013), 381 (Feb. 2014), 309 (Mar. 2014), 378 (June 2014), 374 (July 2014), 371 (Sept. 2014), 367 (Dec. 2014), 363 (Jan. 2015).) Indeed, Dr. Ella-Tamayo saw Plaintiff two months after his defibrillator placement, noted his history of congestive heart failure, examined him, and found that he was at most restricted to the equivalent of medium exertional work. (See AR 292-97.)

Even in the months just before the defibrillator was placed, Plaintiff recorded an ejection fraction of "20 to 25%" (AR 256), but examinations by cardiologists at the time revealed "no chest wall tenderness," "normal" heart function, and lungs "clear to auscultation" (see AR 253 (May 2013), 260 (June 2013), 264-65

(July 2013); see also AR 347-48 (Sept. 2013: preoperative and postoperative chest x-rays showing no "radiographic" evidence of "acute disease")).  Thus, the evidence of record supported the ALJ's rejection of Dr. Hernandez's opinion in this regard.  See Batson, 359 F.3d at 1195 (treating physician's opinion can be given "minimal evidentiary weight" when "conclusory, brief, and unsupported by the record as a whole or by objective medical findings" (citation omitted)).

b.  *Medical-Opinion Evidence*

The ALJ rejected Dr. Hernandez's opinions in part because they were "contradicted" by Dr. Ella-Tamayo's.  (AR 29.) Plaintiff contends that he instead should have given Dr. Hernandez's opinions "significant if not controlling weight" because she was his longtime treating physician.  (J. Stip. at 11.)  The opinion of an examining physician can be weighted over a treating physician's, however, as long as the ALJ provides a specific and legitimate reason "based on substantial evidence in the record."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); see Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (as amended) (ALJ responsible for "resolving conflicts in medical testimony"); cf. Lester, 81 F.3d at 831-32 ("nonexamining" physician's opinion cannot "by itself" constitute substantial evidence justifying "rejection of the opinion of either an examining physician or a treating physician" unless ALJ provides "record evidence to support it" (emphasis in original)). The ALJ here did just that.  (AR 29.)

Dr. Ella-Tamayo found that Plaintiff could push, pull, lift, and carry 50 pounds occasionally and 25 pounds frequently; sit

22

without restriction; and stand and walk for six hours in an eight-hour workday. (AR 297.) Unlike Dr. Hernandez's more restrictive opinions, Dr. Ella-Tamayo's assessments were supported by her own "detailed clinical findings" on examination, as noted by the ALJ. (AR 29); see <u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007) ("[W]hen an examining physician provides 'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.'" (citation omitted)). Indeed, they showed that Plaintiff had full "5/5" strength in each of his extremities, adequate straight-leg raises, adequate grip strength, "normal" gait, and "normal" range of motion in his back, arms, and legs. (AR 295-96.) Moreover, as also found by the ALJ (AR 29), Dr. Ella-Tamayo's opinion was supported by evidence throughout the record of adequate respiratory, cardiovascular, and joint function despite Plaintiff's complaints otherwise, as already discussed.

Plaintiff contends that Dr. Ella-Tamayo's opinion did not involve "physical exertion testing" and as such did not contradict Dr. Hernandez's opinion that his impairments "stem[med] specifically from physical exertion." (J. Stip. at 19-20.) But Plaintiff is mistaken. Dr. Ella-Tamayo's opinion, was based on "physical," "musculoskeletal," and "neurological" examinations, which included exertion-based tests for grip strength and straight-leg raising. (See AR 294-96.) Moreover, it is unclear that Dr. Hernandez ever conducted exertion testing herself, providing no basis for crediting her opinion over Dr. Ella-Tamayo's on that basis.

23

Thus, as explained, Dr. Ella-Tamayo's opinion was sufficiently supported by substantial evidence, and the ALJ properly discounted Dr. Hernandez's opinion for its inconsistency with it.[10] See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ properly rejected treating physician's opinion in part because examining physician's contrary opinion "constitute[d] substantial evidence" for so finding, as "it rest[ed] on his own independent examination," and because treating-source opinion was unsupported by either "treatment notes" or "objective evidence").

### c.   *Internal Inconsistency*

Internal inconsistency is a specific and legitimate basis for discounting a treating physician's opinion. See Melton v. Comm'r of Soc. Sec. Admin., 442 F. App'x 339, 341 (9th Cir. 2011) (citing Bayliss, 427 F.3d at 1216); Donathan v. Astrue, 264 F.

---

[10] The ALJ also gave greater weight to Dr. Ella-Tamayo's opinion because she was "familiar with the Social Security Disability program," which "enhanc[ed] the reliability of her opinion." (AR 29.)  This finding may have been improper.  See Dipietro v. Colvin, No. 8:15-CV-01374 (VEB), 2016 WL 3452909, at *9 (C.D. Cal. June 15, 2016) (rejecting as basis for discounting treating physician's opinion that he was "not familiar" with SSA guidelines in part because he was "undoubtedly familiar" with plaintiff); Valdez-Canez v. Colvin, No. CV-16-02780-PHX-DGC, 2017 WL 2351664, at *4 (D. Ariz. May 31, 2017) ("Whether or not [physician] is trained in or even familiar with the Social Security Regulations is irrelevant to the question of whether the ALJ should credit his opinion concerning [p]laintiff's limitations and ability to sustain full-time work.").  Plaintiff has not challenged the ALJ's reasoning in this regard, however, and any potential error was harmless because the ALJ provided specific and legitimate reasons for crediting Dr. Ella-Tamayo's opinion over Dr. Hernandez's, as already discussed.  See Howell v. Comm'r Soc. Sec. Admin., 349 F. App'x 181, 184 (9th Cir. 2009); DeBerry v. Comm'r of Soc. Sec. Admin., 352 F. App'x 173, 176 (9th Cir. 2009).

App'x 556, 560 (9th Cir. 2008) (recognizing "inconsistent statements" in physician's opinion as specific and legitimate basis for rejecting it). The ALJ here found that Dr. Hernandez's March 2014 opinion — specifically, that Plaintiff had a 25-pound "carrying limit" (AR 404) — contradicted her April 2014 opinion that Plaintiff could occasionally lift up to 10 pounds but never anything more (AR 401; see also AR 28-29). Plaintiff contends that lifting 25 pounds at one time was consistent with lifting 10 pounds "repetitively in a competitive work situation." (J. Stip. at 19.) His argument, however, fails to address the actual inconsistency identified by the ALJ.

Dr. Hernandez stated that Plaintiff could lift no more than 25 pounds but then a month later stated that he could lift no more than 10 pounds. (See AR 400-01, 404; see also AR 28-29.) How often he could lift 10 pounds was beside the point, as his inability to lift any more weight contradicted the earlier assessment that he could. Plaintiff's condition didn't notably change in the month between Dr. Hernandez's opinions, as observed by the ALJ. (AR 29.) Rather, the opinions simply contradicted each other, without explanation; this was a specific and legitimate reason for discounting them. See Melton, 442 F. App'x at 341; Donathan, 264 F. App'x at 560.

In any event, even if the ALJ erred, he provided other specific and legitimate reasons for discounting Dr. Hernandez's opinions, as discussed. See Howell v. Comm'r Soc. Sec. Admin., 349 F. App'x 181, 184 (9th Cir. 2009); DeBerry v. Comm'r of Soc. Sec. Admin., 352 F. App'x 173, 176 (9th Cir. 2009). And because the ALJ appropriately rejected Dr. Hernandez's opinions, he was

not required to incorporate her findings into the RFC.  The RFC
he determined instead contained limitations that had been
substantiated in the record, such as those opined by Dr. Ella-
Tamayo.  See Bayliss, 427 F.3d at 1217; Batson, 359 F.3d at 1197.
The ALJ therefore didn't err in his RFC determination, and remand
is unwarranted on this ground.

      B.   Plaintiff's Step-Four Challenge Is Forfeited

     When a claimant is represented by counsel, he must raise all
issues and evidence before the Commissioner "in order to preserve
them on appeal."  Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir.
1999) (as amended); accord Shaibi v. Berryhill, 883 F.3d 1102,
1109 (9th Cir. 2017).  Here, Plaintiff was represented by counsel
throughout his administrative proceedings (see, e.g., AR 38-76,
128, 239-40) yet failed to raise any step-four issue to either
the ALJ (see AR 38-76) or the Appeals Council (see AR 239-40).
The step-four issue he raises now is thus forfeited.  See Shaibi,
883 F.3d at 1109-10 (holding that issue was "forfeited" when it
was not raised to either "the ALJ or the Appeals Council"
(emphasis in original)).

     Plaintiff suggests that Sims v. Apfel, 530 U.S. 103 (2000),
and Edlund compel otherwise.  (J. Stip. at 24-25.)  They do not.
"Sims concerned only whether a claimant must present all relevant
issues to the Appeals Council to preserve them for judicial
review."  Shaibi, 883 F.3d at 1109 (emphasis in original) (citing
Sims, 530 U.S. at 107).  Issue-exhaustion at that stage was
unnecessary as to issues that had been raised to the ALJ, Sims
held, explicitly declining to consider "[w]hether a claimant must
exhaust issues before the ALJ."  530 U.S. at 107, 112.  Because

Plaintiff here failed to raise his step-four claim not only to the Appeals Council but also the ALJ, Sims doesn't control. Edlund, too, is inapposite because it dealt with a claim not raised to either the Appeals Council or the district court and made no mention of a failure to raise the claim to the ALJ. See 253 F.3d at 1160 n.9.

In any event, even if Plaintiff's claim were considered, remand would remain unwarranted. As Plaintiff contends, the VE classified his past work as a "hybrid of two jobs." (AR 58.) The ALJ "accepted" that classification but found that he could perform his "hybrid" and "combined" past work as each of its component jobs is generally performed. (AR 30-31.) In so doing, the ALJ erred, see Soc. Sec. Admin., Program Operations Manual System (POMS) DI 25005.020(B), https://secure.ssa.gov/ poms.nsf/lnx/0425005020 (precluding "generally performed" analysis for composite past work), but the error was harmless.

Plaintiff's status as a younger individual on the date of the ALJ's decision[11] and his RFC for the "full range of medium work" — which the ALJ properly determined, as discussed above — mandated a finding of nondisability under the grids. See 20 C.F.R. pt. 404, subpt. P, app. 2, Rs. 203.25 to .31; Robbins, 466 F.3d at 885 (ALJ error harmless when it "was 'inconsequential to the ultimate nondisability determination'" (quoting Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055-56 (9th Cir.

---

[11] A "younger individual" is defined as someone who is between the ages of 18 and 49 years old. 20 C.F.R. pt. 404, subpt. P, app. 2, R. 201.00(h)(1). On August 31, 2015, the date of the ALJ's decision, Plaintiff was 47. (See AR 77 (birth year of 1968).)

2006))).

Plaintiff, moreover, hasn't alleged any inconsistency between his RFC and his past relevant work as actually performed. (See J. Stip. at 25-26 (arguing only that ALJ's step-four error was harmful if RFC was incorrect).) Indeed, his testimony and work-history report suggested that his past work as actually performed did not exceed the requirements of medium work. (See AR 56-57 (Plaintiff testifying that past work involved lifting at most 50 pounds, occasionally lifting 25 pounds, and sitting "80% of the time"), 176 (work-history report indicating that past work involved one hour of walking, one hour of standing, six hours of sitting, and lifting at most 50 pounds and frequently 25 pounds)); see also §§ 404.1567 ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."), 416.967 (same); SSR 83-10, 1983 WL 31251, at *6 (1983) ("A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds.").

Thus, Plaintiff would still have been found not disabled notwithstanding any step-four error by the ALJ. See Robbins, 466 F.3d at 885.[12]

---

[12] Plaintiff also argues that the ALJ erred because he failed to pose any hypothetical to the VE. (J. Stip. at 20.) Indeed, he didn't (see AR 57-58), but that wasn't error. He was not required to solicit such VE testimony. Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) (VE testimony at step four is "useful" but "not required"); accord Stout, 454 F.3d at 1055. It was Plaintiff's burden, not the Commissioner's, to prove that he

# VI. CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and GRANTING judgment in Defendant's favor.

DATED: July 2, 2018

_Jean Rosenbluth_
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

couldn't return to his past relevant work. §§ 404.1520(f), 416.920(f); <u>Lewis v. Barnhart</u>, 281 F.3d 1081, 1083 (9th Cir. 2002). Nonetheless, like the ALJ, Plaintiff posed no hypothetical to the VE despite being given the express opportunity to do so. (<u>See</u> AR 57-58.) Thus, the lack of a hypothetical wasn't erroneous. Even if it were, it was harmless for the reasons discussed. <u>Cf.</u> <u>Stout</u>, 454 F.3d at 1055 (error harmless when it "occurred during [VE] hypothetical [that] ALJ was 'not required' to ask" (quoting <u>Matthews</u>, 10 F.3d at 681)).

[13] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."